# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 13, 2010 Session

## STATE OF TENNESSEE v. TAMABE TRINISE LEKE

**Direct Appeal from the Circuit Court for Madison County**
**No. 09-352   Donald H. Allen, Judge**

_____

**No. W2009-02583-CCA-R3-CD  - Filed October 15, 2010**

_____

The Defendant-Appellant, Tamabe Trinise Leke, was convicted by a Madison County jury of disorderly conduct, a Class C misdemeanor, and resisting arrest, a Class B misdemeanor. She was sentenced to thirty days for disorderly conduct and to six months for resisting arrest. The trial court ordered these sentences to be served concurrently. On appeal, Leke challenges the sufficiency of the evidence for both convictions. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

George M. Googe, District Public Defender; Gregory D. Gookin, Assistant Public Defender, for the Defendant-Appellant, Tamabe Leke.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Brian Gilliam, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

**Background.** On December 12, 2008, Leke, along with her two-month-old daughter, attended a birthday party for two children of a friend, ages three and six. There were several young children and adults at the birthday party. Officers with the Jackson Police Department came to the party, spoke with the hostess, and gained consent to enter the apartment. The officers were looking for the brother of the hostess, who was alleged to have been involved in a robbery that occurred earlier that day. The hostess advised the officers that her brother was in a back room of the apartment. The officers proceeded to the back room, which was

the same room where the children were located, to talk to the robbery suspect. One of the officers eventually used mace on the robbery suspect. A struggle ensued. The other people at the party were ordered outside of the apartments and a large crowd gathered. Multiple police units were called to the scene to disperse the crowd and Leke was one, among others, who was arrested for disorderly conduct and resisting arrest. The following detailed testimony was adduced at trial.

**Trial**. Officer Kevin Mooney of the Jackson Police Department testified that he responded to a call for assistance at the apartment complex on the day of the offense. Officer Mooney said all available units were directed to that location. When he arrived at the apartment complex, he said there were "[s]everal police cars and a lot of people." Officer Mooney stated that people were "yelling and screaming" and that "everything was chaotic." He estimated that between thirty and fifty people were standing around the parking lot and along the apartments. Officer Mooney was directed by Sergeant Mike Landreth to help break up the crowd. He stated:

> When I first got there, it was apparent something was going on. It was a lot of people. A lot of yelling. We kind of identified two people that were the main instigators so to speak. They were marching back and forth, stomping, throwing their hands up, yelling and it appeared from a distance that they were trying to entice the crowd to act up even more.

Officer Mooney identified Leke as one of the main instigators. He approached Leke and told her that she needed to leave the parking lot. She responded, "'We don't have to do anything you Mother F-ckers [sic] say.'" Officer Mooney repeated his order to disperse. Leke responded that she could not leave because the police vehicles blocked the exit. Officer Mooney instructed her to sit in her vehicle until the police left. Leke again protested that she did not have to follow the orders of the police. At that point, Officer Mooney told Leke that she was under arrest. He testified that the basis for the arrest was disorderly conduct. Officer Mooney explained that the scene at the apartment complex was extremely volatile and that Leke added to the hysteria by trying to incite the crowd. He stated, " I would ask her a question or make a statement that she needed to move or needed to go and she would just keep repeating, "'We don't have to do what these mother f-ckers [sic] say.'"

Officer Mooney testified that Leke resisted his efforts to handcuff her. He stated:

> I reached out for her hand and obviously I'm a lot larger than she is and she pulls back away from my hand three good times with all her might. At that point another individual that I've yet to identify jumped across both of us and then other officers came on and we had to separate the group and . . . I believe

Officer [Marvin] Rodish was the one that ended up handcuffing her and taking
her into custody.

Officer Mooney testified that Leke was forced to the ground before being handcuffed. He said Leke "was violently resisting the entire time." Officer Mooney estimated that it took between fifteen and twenty seconds to handcuff Leke. He stated that more than twenty officers ultimately reported to the apartment complex. Officer Mooney said none of the people in the parking lot tried to physically confront him.

Sergeant Mike Landreth of the Jackson Police Department was the shift supervisor that evening. He responded to the call for assistance at the apartment complex. He described the situation upon his arrival:

It was just mass confusion. I didn't know what had gone on at that time. I saw a lot of patrol cars over there. I couldn't tell you exactly how many officers. I'm going to guess 15 to 20, maybe extra cars were over there at the time. I got out of the car. It was confusion. People were everywhere. It was a lot of screaming and yelling. I told the officers to move in and start breaking up the crowd and to tell everybody to move on and break it up. I didn't know if our people had actually even got out of the apartment yet with the suspects. I just knew it was a bad situation at that point.

Sergeant Landreth testified that several scuffles broke out amongst the crowd and that multiple arrests were made. Sergeant Landreth did not see Leke involved in a scuffle.

Officer Marvin Rodish of the Jackson Police Department also responded to the request for assistance at the apartment complex. Upon arrival, he was directed by Sergeant Landreth to break up the crowd. Officer Rodish stated that he told the people in the crowd to leave the area. Officer Rodish testified that the majority of the crowd did not heed the order to disperse.

Officer Rodish said he observed Officer Mooney attempting to arrest Leke. He stated that Officer Mooney "was having some difficulty due to the fact that [Leke] was fighting him." Leke's "hands were flailing around the air and [she] was basically not following his commands." Officer Rodish went to assist Officer Mooney with the arrest. Officer Rodish stated:

I attempted to gain control of Ms. Leke. At that time me and Officer Mooney went to the ground with her. When we went to the ground, she was still

fighting. She had her arms under her stomach which was on the ground and would not give us her arms to place her under arrest.

Officer Rodish said Leke was eventually placed in handcuffs after a minute of fighting.

On cross-examination, Officer Rodish acknowledged that he used some force in handcuffing Leke. Officer Rodish used a "minimum amount of force" in grabbing her arms and pulling them behind her back.

The defense called Ashley Douglas as its first witness. She testified that she was at the apartment complex for the birthday party. She temporarily left the apartment that hosted the party. When she returned, several police officers were in the apartment. Douglas saw "a lot of fighting" in the apartment. She said Leke was not fighting. Douglas testified that two individuals from the apartment were taken to a police vehicle. A crowd developed in the parking lot, and it began yelling "bad stuff" at the officers. The officers told the crowd to leave.

Douglas testified that she witnessed Leke's arrest. Leke was instructed by the officers to be quiet. Leke's brother tried to get Leke to leave the parking lot; however, several officers "rushed" Leke before her brother could grab her. Douglas said the police struck Leke's brother in the head. On cross-examination, Douglas testified that three or four officers assisted with Leke's arrest. Douglas did not believe that the officers had trouble arresting Leke because several officers rushed her at once.

Leke testified that she also attended the birthday party at the apartment complex. She confirmed that the officers came to the party. She further stated that one of the officers maced one of the suspects before placing him in handcuffs. Leke said a fight broke out in the hallway causing the officers to call for backup.

Leke testified that people began to gather outside when the robbery suspect was taken to the police vehicle. She said, "Everybody was screaming." Leke was angry because the officer sprayed mace near her child. She asked the police, "'Why do ya'll have to mace him while my baby was in the room?'" The police instructed Leke to leave the parking lot. She explained that the exit to the parking lot was blocked by police vehicles. Leke said the police ordered her to go inside or sit in her vehicle. She told an officer that she was going to get her children. When Leke then turned her back, an officer grabbed her arm and pushed her into a brick wall. Leke said she was forced to the ground. She struggled with the officer and started cussing. Leke said only one of her arms was handcuffed. She swung her other arm in an effort to get the officer off of her. Leke was asked what her name was and she cursed at the officer in response. Leke said she struggled with the police for a minute before she was handcuffed. She denied that she was trying to instigate the crowd.

-4-

On cross-examination, Leke denied that she was yelling at the police. She stated, "I was yelling at my sister. I said, 'We don't have to be treated like this.' I said, 'They didn't have to do it like that.' We were talking to the people in the crowd." Leke claimed she did not struggle with the police until after she was handcuffed. She stated that after an officer forced her to the ground, he put his knee in her back. At that point, Leke said she started cussing at the officer. She denied telling the people in the crowd that they did not have to follow the orders of the police. Leke believed the police tried to mace her child.

Following the testimony at trial, the jury convicted Leke of disorderly conduct and resisting arrest. She filed a motion for new trial that was denied. Leke filed a timely notice of appeal.

## ANALYSIS

Leke claims the evidence was insufficient to support her convictions for disorderly conduct and resisting arrest. First, she argues that her conviction for disorderly conduct was improper because she did not yell at the police until after she was arrested. She also claims she was frustrated by the police officers' use of mace near her child. Second, Leke contends that her conviction for resisting arrest was improper because her actions did not rise to the level of a criminal offense. In response, the State claims the evidence supports both convictions. It asserts that Leke committed disorderly conduct because she engaged in threatening behavior that caused a hazardous situation. The State also argues that Leke resisted arrest by obstructing the police officers' efforts to handcuff her. Upon review, we agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, this court must consider "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." The requirement that guilt be found beyond a reasonable doubt is applicable in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977) and Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).

When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." State v. Philpott, 882 S.W.2d 394, 398 (Tenn. Crim. App. 1994) (citing State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978), superseded by statute on other grounds as stated in State v. Barone, 852 S.W.2d 216, 218 (Tenn. 1993)). This court has often stated that "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." Bland, 958 S.W.2d at 659 (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citation omitted).

Leke was convicted of disorderly conduct under Tennessee Code Annotated section 39-17-305. This section states:

> (a) A person commits an offense who, in a public place and with intent to cause public annoyance or alarm:
>
> (1) Engages in fighting or in violent or threatening behavior;
>
> (2) Refuses to obey an official order to disperse issued to maintain public safety in dangerous proximity to a fire, hazard or other emergency; or
>
> (3) Creates a hazardous or physically offensive condition by any act that serves no legitimate purpose.
>
> (b) A person also violates this section who makes unreasonable noise that prevents others from carrying on lawful activities.

T.C.A. § 39-17-305 (2008).

Here, the evidence supports the conviction for disorderly conduct under section 39-17-305(a)(3). Several officers described the scene at the apartment complex as volatile and chaotic. Officer Mooney testified that an arrest had recently been made and a crowd of thirty to fifty people had accumulated in the parking lot. Officer Mooney said the people in the crowd were "yelling and screaming." The police ordered the crowd to disperse; however, according to Officer Rodish, "the majority of the crowd was staying put where they were." Douglas testified that the crowd was yelling "bad stuff" at the officers. Sergeant Landreth said several scuffles broke out and multiple arrests were made. Officer Mooney testified that Leke exacerbated the situation by trying to incite the crowd. He said Leke was "flailing about, marching, stomping back and forth, yelling and screaming." Officer Mooeny testified that Leke repeatedly yelled to the crowd, "'We don't have to do anything these mother f-

ckers [sic] say.'" Officer Mooeny said she continued to make these exclamations even after the police ordered the crowd to disperse. The foregoing testimony shows that Leke tried to incite an already volatile crowd, thereby creating a hazardous condition that served no legitimate purpose. By telling the crowd that it did not have to follow the police officers' orders, Leke clearly acted with the intent to cause public annoyance or alarm.

We are unpersuaded by the two arguments set forth in Leke's brief. First, she argues that her conduct was excusable because she did not yell at the police until after she was arrested. This claim is not supported by the record as Officer Mooney testified that Leke's disorderly conduct occurred before he initiated the arrest. Leke's second argument is that her conduct was justified because she was frustrated with the police officer's use of mace near her child. The record shows that Leke's two month old daughter was in the same room when an officer maced a robbery suspect. It does not show, however, that the child was harmed in any way by the officers' conduct. Although we sympathize with Leke's concern over her two-month old daughter, Leke's "frustration" is not an excuse to disregard a lawful command from a police officer. We conclude that a rational jury could have found Leke guilty of disorderly conduct. Accordingly, she is not entitled to relief on this issue.

Leke was also convicted of resisting arrest under Tennessee Code Annotated section 39-16-602(a). This section states:

> It is an offense for a person to intentionally prevent or obstruct anyone known to the person to be a law enforcement officer, or anyone acting in a law enforcement officer's presence and at the officer's direction, from effecting a stop, frisk, halt, arrest or search of any person, including the defendant, by using force against the law enforcement officer or another.

T.C.A. § 39-16-602(a) (2008).

The evidence shows that Leke intentionally obstructed the police officers' efforts to conduct her arrest. Officer Mooney testified that when he attempted to handcuff Leke, she pulled away from him "three good times with all her might." Leke was eventually forced to the ground. Officer Mooney testified that she "was violently resisting the entire time." Officer Rodish observed Officer Mooney attempting to arrest Leke. He said Officer Mooney "was having some difficulty due to the fact that [Leke] was fighting him." Officer Rodish testified that Leke's "hands were flailing around the air and [she] was basically not following [Officer Mooney's] commands." Officer Rodish went to assist Officer Mooney with the arrest. Officer Rodish stated:

> I attempted to gain control of Ms. Leke. At the time me and Officer Mooney went to the ground with her. When we went to the ground, she was still

fighting. She had her arms under her stomach which was on the ground and would not give us her arms to place her under arrest.

Leke acknowledged that she struggled with the officer for a minute after she was forced to the ground. She stated that after one of her arms was handcuffed, she started swinging her other arm in an effort to get the officer off of her back. In considering this evidence in the light most favorable to the State, Leke intentionally obstructed the police's efforts to arrest her.

The only remaining question under section 39-16-602(a) is whether Leke used force against the police while obstructing the arrest. The term "force" is defined as "compulsion by the use of physical power or violence and shall be broadly construed to accomplish the purposes of this title." T.C.A. § 39-11-106(a)(12) (2008). The State claims the circumstances of this case are similar to those in State v. Mary Margaret Boyd. No. M2004-00580-CCA-R3-CD, 2005 WL 885091 (Tenn. Crim. App., at Nashville, Apr. 15, 2005). There, the police responded to a roadside accident. Id. at *1. An officer asked the defendant, who was visibly intoxicated, what her name was. Id. The defense provided her name before cursing at the officer. Id. This court described the events that followed:

> When Officer Roberts attempted to arrest and handcuff the defendant she became belligerent and the defendant and the officer "wallowed around all over the ground." The defendant tried to strike the officer with her fist, but was unsuccessful. The defendant "actively resisted the arrest by twisting, turning and pulling away."

Id. This court held that the defendant used sufficient force against the officer. Id. at *3. In reaching its decision, it stated:

> When this Court has previously addressed this issue, we have held that struggling with officers and flailing one's arms while officers are attempting to handcuff an arrestee is sufficient use of force by the arrestee to sustain a conviction for resisting arrest under Tennessee Code Annotated section 39-16-602. State v. Daniel M. Tidwell, No. 01C01-9807-CC-00288, 1999 WL 436840, at *3 (Tenn. Crim. App., at Nashville, June 30, 1999).

Id.

In considering State v. Mary Margaret Boyd, we agree with the State that Leke used an adequate degree of force against the police. We recognize that unlike the defendant in State v. Mary Margaret Boyd, there was no testimony that Leke attempted to hit an officer. Nonetheless, Officer Mooney testified that Leke "violently" resisted his efforts to handcuff

her.  Officer Mooney stated that when he initially tried to apply the handcuffs, Leke pulled away "three good times with all her might."  Officer Rodish said Leke was forced to the ground, but continued to fight with the officers.  Leke admitted that she started swinging her free arm in an effort to get an officer off of her back.  In light of this testimony, we hold that sufficient evidence was presented that Leke used force against the police.  She is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing, the judgments of the trial court are affirmed.


_____
CAMILLE R. McMULLEN, JUDGE